1  Stanley D. Saltzman, Esq. (SBN 090058)
   Marcus J. Bradley, Esq. (SBN: 174156)
2  **MARLIN & SALTZMAN**
   29229 Canwood Street, Suite 208
3  Agoura Hills, California 91301
   (818) 991-8080  Fax: (818) 991-8081
4  ssaltzman@marlinsaltzman.com
   mbradley@marlinsaltzman.com
5

6  Attorneys for Plaintiff

7

8              **UNITED STATES DISTRICT COURT**

9         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11 SANDRA QUARLES, an individual,        Case '09.CV 2 1 7 9 DMS   NLS
   on her own behalf and on behalf of all
12 others similarly situated,            **CLASS ACTION COMPLAINT**

13                    Plaintiff,          **1. VIOLATION OF UNFAIR
   v.                                         BUSINESS PRACTICES
14                                            ACTION [*BUSINESS &
   UNION BANK, N.A. (ALSO DBA                 PROFESSIONS CODE
15 UNION BANK OF CALIFORNIA),                 SECTION 17200, ET SEQ.*]
   UNIONBANCAL CORPORATION,
16 and DOES 1-100, inclusive,            **2. VIOLATION OF UNFAIR
                                             BUSINESS PRACTICES ACT
17                    Defendants,             [*BUSINESS & PROFESSIONS
                                             CODE* SECTION 17500, *ET
18                                            SEQ.*]

19                                       **3. FRAUD**

20                                       **4. NEGLIGENT
                                             MISREPRESENTATION**
21
                                         **5. BREACH OF THE IMPLIED
22                                           COVENANT OF GOOD FAITH
                                             AND FAIR DEALING**
23
                                         **6. CONVERSION**
24
                                         **7. UNJUST ENRICHMENT AND
25                                           RESTITUTION**

26                                       **DEMAND FOR JURY TRIAL**

27 / / /

28
                              1
   _____
                                    CASE NO. ___
                                    **CLASS ACTION COMPLAINT**

FILED

09 OCT -2 PM 3: 20

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

BY FAX

1    Plaintiff, Sandra Quarles, on behalf of herself and all similarly situated
2  persons, herein alleges as follows:

3                                  **INTRODUCTION**

4        1.    This is a civil action primarily seeking from Defendants Union Bank,
5  N.A. (dba "Union Bank of California") and UnionBanCal Corporation (together
6  referred hereinafter as "Union Bank," "Defendants," and/or "Defendant Union Bank")
7  restitution and disgorgement of all profits gained as a result of wrongfully taking
8  overdraft fees from Union Bank customers via practices which unlawfully maximized
9  such overdraft fees including:

10              (a)    resequencing transactions so that an increased number of
11                     overdraft fees were charged to customers;
12              (b)    charging overdraft fees for debit card transactions and ATM
13                     withdrawals despite there being sufficient funds in the checking
14                     accounts to cover these transactions at the time they were made;
15              (c)    approving transactions that Union Bank knew would result in an
16                     overdraft without providing an opt-out of its automatic fee-based
17                     overdraft scheme at the time of an overdrafting transaction;
18              (d)    providing inaccurate available balance information to customers,
19                     and misrepresenting to customers that a transaction within the
20                     "available balance" will not result in an overdraft; and,
21              (e)    posting/reversing/re-posting debits so that an accurate "available
22                     balance" cannot be known by the customer.

23       2.    Plaintiff also seeks remedies for Union Bank's failure to: adequately
24  notify its customers of its policies and practices regarding its automatic overdraft
25  scheme in the account agreement or online disclosures; inform customers of their
26  right to opt out of its automatic overdraft scheme; and, fail to provide clear account
27  statements that identify the processing order of transactions and which transactions

28

1  comprise multiple overdrafts.  Finally, Plaintiff seeks to enjoin Defendants from
2  continuing to conduct such improper activities.

3       3.     Plaintiff, for herself and all other similarly situated, brings this action
4  pursuant to the Unfair Business Practices Act, *Business & Professions Code*
5  section 17500, *et seq.*; and False Advertising, *Business & Professions Code*
6  section 17500, *et seq.*; as well as California common law fraud, negligent
7  misrepresentation and breach of the implied covenant of good faith and fair dealing.

8       4.     The "Relevant Time Period" is designated as the time from four years
9  prior to the date this Complaint was filed, through the date judgment is entered, based
10 upon information and belief that the violations described above, and as described
11 more fully hereinafter, began long four years prior to this Complaint was filed, and
12 are continuing.  Plaintiff herein reserves the right to amend this Complaint to reflect
13 a different "Relevant Time Period" as discovery in this matter proceeds.

14                              **THE PARTIES**

15      5.     Plaintiff is and, at all relevant times herein, was a resident of San Diego
16 County, California.  She entered into a contractual relationship with Union Bank in
17 the County of San Diego, California, and her account is currently maintained at the
18 Point Loma branch of Union Bank in the County of San Diego.  Plaintiff has incurred
19 multiple improper overdraft fees in connection with use of her Union Bank debit card.

20      6.     Defendant Union Bank is owned by Defendant UnionBanCal
21 Corporation, which is incorporated in Delaware and located in San Francisco,
22 California.  Defendant UnionBanCal Corporation is the holding company for The
23 Bank of Tokyo-Mitsubishi UFJ, LTD., a Japanese corporation with a U.S.
24 headquarter in California.  Both Defendant UnionBanCal Corporation and The Bank
25 of Tokyo-Mitsubishi UFJ, LTD. provide diversified financial services, including
26 banking, insurance, investments, mortgage banking and consumer finance to
27 individuals, businesses, and institutions in all 50 states an internationally.

28

3

CASE NO. __<br>CLASS ACTION COMPLAINT

7.    Union Bank maintains branch offices throughout the state of California and in several other states.  Individual customer accounts are maintained at these branch offices.

8.    The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1 through 100, inclusive, are unknown to Plaintiff, who therefore sues said Defendants under fictitious names.  Plaintiff is informed and believes, and thereon alleges, that each named and/or DOE Defendant is responsible in some manner for the acts, occurrences and liabilities alleged and charged herein. Plaintiff will amend this complaint to properly identify such Defendants once their identities become known.

9.    Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein, each Defendant identified herein as "DOE" was the agent, joint-venturer, servant or employee of each of the other Defendants, and the acts of each Defendant were within the course and scope of his, her, or its agency, joint venture and/or employment, and/or fell within the purview of the actions set forth herein.  Consequently, all Defendants are jointly and severally liable to Plaintiff for the damages sustained as proximate result of their conduct.

## JURISDICTION AND VENUE

10.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  The amount-in-controversy exceeds the sum of $5,000,000 exclusive of interest and costs, and there is minimal diversity because certain members of the class are citizens of different state than any defendant as required by 28 U.S.C., section 1332(d)(2). Jurisdiction over Union Bank is proper because it has regularly conducted, and continues to regularly conduct, business within this state, purposefully availing itself of the privilege of doing so.

11.    Venue as to Defendant is proper in this judicial district because Defendants Union Bank, N.A. and UnionBanCal Corporation do substantial business

4

1  in this judicial district and some of the acts complained of occurred in this judicial

2  district.

3      12.  Venue is also proper in this district because Plaintiff lives here, because

4  Union Bank has branches in San Diego County, and because Union Bank has

5  received substantial fees from customers who hold accounts here.

6  **CHOICE OF LAW**

7      13.  Plaintiff brings this action under the laws of the State of California.

8      14.  Union Bank's choice-of-law agreement specifies that the law of the state

9  in which the customer's account is based governs the relationship. Plaintiff's account

10  is based in San Diego, California. Accordingly, the laws of California govern.

11      15.  California's interest in this action, which seeks to protect the rights and

12  interests of California residents, is greater than any other state.

13      16.  Application of California law is neither arbitrary nor fundamentally

14  unfair because California has significant contacts and a significant aggregation of

15  contacts that create a state interest in this litigation.

16  **GENERAL ALLEGATIONS**

17      17.  Union Bank is a consumer banking company servicing hundreds of

18  thousands of individual and business customers nationwide. One of the services

19  provided by Union Bank for its customers is a check/debit/ATM card (hereinafter

20  "debit card") that can be used by a customer to access funds in his or her Union Bank

21  account to conduct various financial transactions such as a purchase at a vendor (*i.e.*,

22  a point of sale or "POS" transaction), a cash withdrawal from an ATM machine, or

23  an on-line payment (hereinafter "debit transaction"). As debit transactions are

24  processed electronically, Union Bank is aware of the use of the debit card and has the

25  option to accept or decline transactions at the time of the debit transaction.

26      18.  If a customer does not have sufficient funds in his or her account when

27  the debit transaction is processed, it is considered an "overdraft." Union Bank may

28

5

1    allow an overdraft debit transaction to go through despite its knowledge that the

2    account has insufficient funds to cover the debit transaction. If Union Bank allows

3    such a debit transaction to proceed, it charges an overdraft fee to the customer's

4    account. Currently, Union Bank overdraft fees range from \$24 to \$34 per overdraft

5    item.

6        19.   It is Union Bank's customary practice to post the highest debit

7    transaction on a day in which multiple transactions are conducted, rapidly depleting

8    the funds in a customer's account, thereby creating a situation in which more

9    overdraft fees are likely to be charged for multiple smaller transactions.  For

10    example, if a customer has \$50 balance and makes four \$10 transactions, and then

11    makes a transaction for \$100, Union Bank will debit the \$100 transaction first,

12    thereby causing the four \$10 transactions to go into overdraft, subjecting the customer

13    to four overdraft fees. Had Union Bank not manipulated the order of the transactions,

14    in this scenario, the customer would have had sufficient funds in his or her account

15    to cover the smaller debits, and only be charged one overdraft fee. *See* FDIC Study

16    o f   B a n k   O v e r d r a f t   P r o g r a m s ,   N o v e m b e r   2 0 0 8 ,

17    http://www.fdic.gov/bank/analytical/overdraft/, at 11, 12.

18        20.   Union Bank has a practice of posting debit transactions prior to posting

19    checks that are presented for payment on that same day. Accordingly, customers are

20    often left with insufficient funds to cover checks written against their account, and

21    are therefore subject to Union Bank's overdraft fees. Whereas, Union Bank, has the

22    resources and ability to decline a debit transaction when there are insufficient funds

23    in the account.

24        21.   Instead of declining debit transactions when there are insufficient funds

25    available in the customer's account, Union Bank routinely approves such transactions

26    when they are initiated.  The design and intent of this automatic fee-based overdraft

27    scheme is solely to increase Union Bank's overdraft fee revenue.  Union Bank's

28

CASE NO. ___
CLASS ACTION COMPLAINT

1    overdraft fees can far exceed the amount of the overdraft debit transaction if the debit

2    transaction is for just a few dollars.    On days when multiple overdraft debit

3    transactions are paid by Union Bank, a customer will incur substantial overdraft fees

4    at once.

5        22.    Based upon information and belief, Union Bank manipulates the

6    reporting of transactions so that the customer cannot know the accurate available

7    balance in his or her account. Namely, Union Bank has a practice of including a debit

8    that lowers the available balance, subsequently reversing the debit, and then posting

9    the transaction again when the items arrives for final payment. The intermediate step

10   of reversing the debit induces overdraft penalties as it misleads the customer into

11   believing there are more funds available in his or her account.

12       23.    As overdraft fees are a primary source of revenue for Union Bank, it

13   seeks to maximize the amount of overdraft fees it charges debit card customers.

14   Union Bank does not alert its customers in  situations where a debit transaction will

15   result in an overdraft and the related overdraft fees. Accordingly, Union Bank's debit

16   card customers are not afforded the opportunity to avoid incurring such fees either by

17   declining the debit card transaction or using another form of payment for the

18   transaction.

19       24.    The  terms of Union Bank's automatic overdraft protection scheme is

20   hidden in the fine print of its account disclosures, and does not include an opt-in

21   provision.

22       25.    Union Bank's failure to notify customers when the use of a debit card

23   will cause an overdraft fee, is a violation of California's consumer protection laws

24   and the implied covenant of good faith and fair dealing in Union Bank's Deposit

25   Agreement, governing its checking accounts.

26       26.    Union Bank's overdraft practices have a disproportionate impact on low-

27   income customers.

28

CASE NO. ___
CLASS ACTION COMPLAINT

27.   Union Bank's actions as alleged herein are in contradiction to "best practices" and guidelines issued by various governmental and regulatory bodies. Specifically, pursuant to rules proposed by the Board of Governors of the Federal Reserve system, the Office of Thrift Supervision, Treasury, and the National Credit Union Administration (hereinafter "Agencies"), "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

28.   Even if a customer carefully tracks the balance in his or her account, Union Bank's overdraft practices make it difficult for a customer to avoid injury. The customer's inability to avoid injury as a result of such practices is noted by the Agencies: "Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or credit for a returned purchase will be made available." 73 F.R. 28904-01, 28929 (May 19, 2008).

29.   Union Bank has failed to follow "best practices" issued by the United States Department of the Treasury, the Office of the Comptroller of the currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation and the National Credit Union Administration and set forth in the "Joint Guidance on Overdraft Protection Programs" (hereinafter "Joint Guidance") which include: "Provide election or opt-out of service. Obtain affirmative consent of consumers to receive overdraft protection. Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt out' of the overdraft program and provide a clear consumer disclosure of this option." 70 F.R. 9127-01, 9132.

CASE NO. ___
CLASS ACTION COMPLAINT

30.     The "best practices" listed in the Joint Guidance further advises banks to "Alert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R.D., 9127, 9132.  It continues, "This notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice." *Id.*

31.     The American Bankers Association in conjunction with Alex Sheshunoff Management published guidelines titled "Overdraft Protection: A Guide for Bankers" ("hereinafter "ABA Guide") that sets "best practices" pertaining to overdrafts. Notably, these "best practices" emphasize disclosure, stating "It is critical that consumer [sic] have the ability to understand which transactions may cause an overdraft situation in their account. . . . The most controversial delivery channels for overdraft services are debit cards, whether at point of sale or at the ATM, because customers are unaware that a debit card transaction that is completed can cause an overdraft and because the overdraft fee can be very large compared with the transaction. . . ." (pp. 8, 9) (Exhibit A)

32.     The ABA Guide also indicates that banks should offer customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur overdraft fees. (pp. 9, 10) (Exhibit A)

## FACTUAL ALLEGATIONS

33.     Plaintiff has been a customer of Union Bank for approximately 20 years. She was issued a debit card by Union Bank that she can use, and has used, to conduct debit transactions during the proposed class period.

34.     During the proposed class period, Plaintiff's debit transactions have been resequenced by Union Bank so that the largest dollar amount is debited first causing

1   Plaintiff to incur unnecessary overdraft charges. For example, on March 20, 2007,
2   Plaintiff was charged $170 in overdraft fees for five separate overdraft items on
3   March 19, 2007. Six items were presented for payment on March 19, 2007: a check
4   in the amount of $100, and five debit transactions in the amounts of $13.40, $27.14,
5   $40.00, $299.48, and $309.80.   Union Bank sequenced the transactions so that the
6   $309.80 debit transaction was deducted first, thereby causing each subsequent
7   transaction to be an overdraft transaction for which Union Bank charged Plaintiff an
8   overdraft fee. Union Bank expressly approved each debit transaction before it was
9   completed, and never provided Plaintiff an opportunity to decline these overdrafting
10  debit transactions. As a result of these practices, Plaintiff has been charged excessive
11  overdrafts fees that could have been minimized and/or avoided had Union Bank not
12  resequenced the debit transactions. (Exhibit B)

13          35.    During the class period, Union Bank had a practice of posting debit
14  transactions prior to paying checks written on Plaintiff's account. Union Bank's
15  practice of deducting debit transactions prior to paying checks written by Plaintiff has
16  caused her to incur excessive overdraft fees. For example, two transactions were
17  posted on January 31, 2008; one transaction was a check in the amount of $30, and
18  the other was a debit transaction in the amount of $127.95. According to the on-line
19  transaction register, there were sufficient funds available in the account to pay the
20  $30 without incurring an overdraft charge. However, as a result of Union Bank's
21  resequencing practices, Plaintiff incurred overdraft fees for both transactions totaling
22  $68, as it debited the larger debit transaction first. (Exhibit C)

23          36.    At no time when Plaintiff made a debit transaction has Union Bank
24  advised her that there was insufficient funds in her account, which would have
25  afforded her the opportunity to cancel the transaction and avoid incurring unnecessary
26  overdraft fees.
27  ///
28

CASE NO. ___
CLASS ACTION COMPLAINT

37.    Based on information and belief, the overdraft fees incurred by Plaintiff are representative of hundreds of millions of dollars of overdraft fees that Union Bank assessed its customers and automatically deducted from their checking accounts when there were sufficient funds in their accounts at the time of the transaction.  This is an especially egregious wrongful taking of customers' money from their checking accounts because Union Bank specifically approved each of these transactions and knew at the time it approved the transaction there was sufficient funds in the account to cover the transaction.

## CLASS ACTION ALLEGATIONS

38.    Plaintiff brings this lawsuit as a class action on behalf of herself and all others similarly situated as members of a proposed Plaintiff Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

39.    The Class is defined as:

All Union Bank customers, who at any time during the period commencing from the past four years to the present, have had a checking account with any of Defendant Union Bank's branches throughout the United States, who have been issued a debit card with that account, and who have been charged overdraft fees against that account for a transaction, when there was sufficient funds in the account to cover the transaction, including those made in connection with a transaction involving a debit card.

40.    Should the Court determine that a nationwide class is not warranted, Plaintiff requests, in the alternative, the certification of a California class consisting of Union Bank customers who maintain a checking account with a branch office in California.

41. The following persons shall be excluded from the Class: (1) Defendants and their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

42. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

43. The Class for whose benefit this action is brought is so numerous that joinder of all Class Members is impracticable. While the exact number and identities of individual Class Members are unknown at this time, Plaintiff is informed and believes that thousands of California residents have been assessed overdraft fees by Defendant Union Bank in connection with use of their check cards.

44. The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class Members, was charged overdraft fees by the Defendant Union Bank. The representative Plaintiff, like all Class Members, has been damaged by Union Bank's misconduct in that she incurred and/or will incur the unlawful overdraft charges. Furthermore, the factual basis of the Bank's misconduct is so common to all Class Members and represents a common thread of unconscionable, unfair and/or deceptive misconduct resulting in injury to all members of the Class.

45. There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting individual Class Members.

46. Among questions of law and fact common to the Class are whether the Bank:

> (a)     manipulates and reorders transactions, including debit

1   transactions and other account transactions such as checks, in
2   order to maximize overdrafts;

3   (b)   manipulates and reorders transactions, including debit
4   transactions and other account transactions such as checks, so
5   that it can increase the number of overdraft charges it imposes;

6   (c)   imposes overdrafts and overdraft fees when, but for reordering
7   transactions, there would otherwise be sufficient funds in the
8   account;

9   (d)   approves debit transactions as part of its overdraft scheme
10   when insufficient funds are available as a means of maximizing
11   overdrafts;

12   (e)   does not accurately report "available balance" information on a
13   real-time basis;

14   (f)   engages in the practice of posting/reversing/re-posting debits
15   so that customers are deceived about the amount of money in
16   their account;

17   (g)   does not obtain affirmative consent from checking account
18   customers prior to processing a transaction that would
19   overdraw the account and result in an overdraft fee;

20   (h)   does not alert its customers that a check card transaction will
21   trigger an overdraft fee and does not provide the customer the
22   opportunity to cancel this transaction;

23   (i)   does not clearly disclose to check card customers that they have
24   the right to "opt out" of its overdraft scheme; and

25   (j)   engages in practices that have damaged Plaintiffs and Class
26   Members.

27   ///

28

13

47. Among the questions of law common to the Class are whether Union Bank:

    (a)    engages in deceptive or unfair acts and practices in violation of California consumer protection laws, including, but not limited to, California *Business & Professions Code* §17200, *et. seq.*, and California *Civil Code* §17500, for which Plaintiffs and the other members of the Class are entitled to recover:

    (b)    acts fraudulently in carrying out its automatic overdraft policies and practices;

    (c)    is negligent in its misrepresentations to Plaintiff and the Class Members as to account balance information;

    (d)    breaches the implied covenants of good faith and fair dealing;

    (e)    converts Plaintiff and Class Members' funds;

    (f)    is unjustly enriched as a result of its overdraft fee policies and procedures; and

    (e)    engages in practices that warrant equitable, injunctive relief.

48. Plaintiff's claims of Union Bank's unfair implementation of centralized, common overdraft fee policies and practices and arise out of the same unconscionable provisions of Union Bank's Deposit Agreement and Disclosures and related documents are typical of the Class. Plaintiff has suffered the harm alleged and Plaintiff has no interests antagonistic to the interests of any other Class Member.

49. Plaintiff is committed to the vigorous prosecution of class actions, and in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

///

50.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Since the amount of each individual Class Member's claims is small relative to the complexity of the litigation, and due to the financial resources of Union Bank, no Class Member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class Members will continue to suffer losses and Union Bank's violation of the law will proceed without remedy.

## FIRST CAUSE OF ACTION

### Violation of *Business And Professions Code* Section 17200, *et seq.* - Unlawful, Fraudulent, and Unfair Business Act and Practices

### (Against all Defendants)

51.  Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein.

52.  Union Bank's conduct described herein violates *Business and Professions Code* §17200 (The Unfair Competition Law, or "UCL") as its policies and practices regarding overdraft fees are unconscionable, constituting unlawful and unfair business acts or practices within the meaning of the UCL, and are likely to mislead the general public, therefore constituting fraudulent business practices within the meaning of the UCL.

53.  The harm to Plaintiff and Class Members arising out of these acts outweighs the utility, if any, of these practices.

54.  The fraudulent, unlawful, and unfair business practices of Union Bank are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class.

55.  Defendants' unlawful, unfair and fraudulent business acts and practices are described throughout this Complaint and include, but are not limited to, improperly resequencing the posting of transactions to maximize overdraft

CASE NO. ___
CLASS ACTION COMPLAINT

1  fees; wrongfully taking overdraft fees directly from customers' checking accounts
2  for transactions where there was sufficient funds in the account at the time of the
3  transaction; and misrepresenting and falsely advertising the accuracy and
4  reliability of the available balance or account balance information.

5     56.    In addition to the above, the conduct as alleged throughout this
6  Complaint provides the basis for a finding of liability under *Business and*
7  *Professions Code* Section 17200, *et seq.*, as well as constitutes breach of contract,
8  negligent misrepresentation, fraud, and breach of the implied covenant of good
9  faith and fair dealing that not only result in liability as individual causes of action.

10    57.    Plaintiff and the Class Members, and each of them, have been
11  damaged by said practices.

12    58.    The conduct of Defendants as described herein violates *Business and*
13  *Professions Code* section 17200, *et seq.*, and other similar state unfair competition
14  and unlawful business practices statutes.

15    59.    Pursuant to *Business and Professions Code* sections 17200 and
16  17203, Plaintiff, on behalf of herself, and all others similarly situated, seeks relief
17  as prayed for below.

18                       **SECOND CAUSE OF ACTION**
19    **Violation of Business and Professions Code Section 17500 *et seq.* -**
20         **False Advertising and Deceptive Business Practices**
21                        **(Against all Defendants)**

22    60.    Plaintiff incorporates by reference and re-alleges all paragraphs
23  previously alleged herein.

24    61.    The standardized practices, advertisements and deceptive
25  representations regarding the Union Bank's practices were uniformly applied to
26  Plaintiff and the Class Members.

27  ///

28

62.    Plaintiff relied on Defendants' deceptive representations and advertisements and was damaged as a result by incurring overdraft charges she otherwise would not have incurred.

63.    Plaintiff, on behalf of herself and the Class, seeks relief as prayed for below.

## THIRD CAUSE OF ACTION

### Fraud

### (Against all Defendants)

64.    Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein.

65.    Union Bank intended to mislead Plaintiff and members of the Class with its misrepresentations, nondisclosure and/or concealment of material facts that Union Bank knew to be false and material.

66.    Accordingly, Plaintiff and the Class Members were actually misled and deceived and were induced by Union Bank to incur overdraft charges they otherwise would not have incurred, and as a result of Defendants' conduct, Plaintiff and the Class Members have been damaged by having unwarranted overdraft fees assessed and taken directly from their account.

67.    Plaintiff seeks punitive or exemplary damages pursuant to *Civil Code* section 3294 in that Defendants engaged in "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant[s] with the intention on the part of the defendant[s] of thereby depriving a person of property or legal rights or otherwise causing injury."

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against all Defendants)

68.    Plaintiff incorporates by reference and re-alleges all paragraphs

17

1  previously alleged herein.

2      69.    Union Bank has and had a duty to provide honest and accurate
3  information to its customers so that those customers may avoid incurring
4  expensive and unnecessary overdraft charges.

5      70.    Union Bank specifically and expressly indicated to Plaintiff that her
6  checking account balance information is accurate and reliable, when in fact such
7  information was inaccurate and unreliable, regardless of where such information
8  is and was made available, including, online, via Defendant's telephone banking
9  system, by ATM machines, and branch inquiries.

10     71.    Union Bank misrepresents the term "account balance" when it uses the
11  term in its various marketing materials, the customer agreement contracts, and the
12  various methods in which customers may access their checking account
13  information, as the "account balance" information provided is not what it purports
14  to be.

15     72.    Union Bank knew or in the exercise of reasonable diligence should
16  have known, that the ordinary consumer and customer of Union Bank's products
17  would understand Union Bank's representations concerning the term "account
18  balance" as being what they purport to be - the actual available balance at the time
19  of the inquiry. Union Bank also knew or in the exercise of reasonable diligence
20  should have known, that the ordinary consumer and customer of its products
21  would understand the marketing materials and the terms of the customers
22  agreement contracts set forth in this Complaint as indicating that the published
23  "account balance" is accurate and reliable. Any other understanding on the part of
24  consumers would not be reasonable given Defendants' representations.

25     73.    In addition, by posting pending charges to online accounts in real
26  time, and then including those charges to provide available balance, Union Bank
27  represented to Class Members that overdraft fees would not be charged for

28

CASE NO. ___
CLASS ACTION COMPLAINT

1  transactions that were less than the balance in the account at the time the
2  transaction took place.

3      74.   Plaintiff and the Class Members reasonably relied on Union Bank's
4  misrepresentations as to their "account balance," and accordingly made debit
5  transactions or ATM withdrawals which were within the limits of their published
6  "account balance" but were nonetheless assessed overdraft fees by Union Bank.

7      75.   As a result of Union Bank's misrepresentations, Plaintiff and the
8  Class Members have been damaged by incurring unnecessary improper overdraft
9  fees as a result of relying on Union Bank's misrepresentations as to their "account
10 balance."

## FIFTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against all Defendants)

14     76.   Plaintiff incorporates by reference and re-alleges all paragraphs
15 previously alleged herein.

16     77.   California law implies a covenant of good faith and fair dealing in all
17 contracts between parties.

18     78.   Union Bank's actions described hereinabove have violated, and
19 continue to violate, the covenant of good faith and fair dealing contained in the
20 agreements which purport to govern Plaintiff's and the Class Members' checking
21 accounts, and as a result thereof, Plaintiff and the Class Members are entitled to
22 damages as prayed.

## SIXTH CAUSE OF ACTION

### Conversion

### (Against all Defendants)

26     79.   Plaintiff incorporates by reference and re-alleges all paragraphs
27 previously alleged herein.

28

80.   Plaintiff and Class Members own and have the right to possess the funds in their checking accounts.

81.   Union Bank interfered, and continues to interfere with Plaintiff and the Class Members' possession of this money by charging unwarranted and unlawful overdraft fees as the result of debit transactions, including POS and ATM transactions, despite the fact that Plaintiff and the Class Members had and/or have sufficient funds in their accounts to cover these transactions at the time they were and/or are made.

82.   Plaintiff and Class Members never affirmatively consented to Union Bank's direct debit of overdraft fees from their checking accounts as a result of debit card transactions that occurred at a time when there were sufficient funds in the their accounts to cover these transactions.

83.   Plaintiff and Class Members have been, and will continue to be, damaged by Union Bank's wrongful assessment of overdraft fees in an amount that is capable of identification through Union Bank's records.

84.   Plaintiff and Class Members are entitled to punitive damages because Union Bank has engaged in fraud, malice or oppression.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment and Restitution

### (Against All Defendants)

85.   Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein.

86.   Union Bank unjustly received a benefit at the expense of Plaintiff and Class Members by unlawfully charging excessive overdraft fees.

87.   It is unjust to allow Union Bank to retain profits from unlawfully and unconscionably charging overdraft fees without providing compensation to Plaintiff and the Class.

CASE NO. ___
CLASS ACTION COMPLAINT

88.    Union Bank acted with conscious disregard for the rights of Plaintiff and Class Members.

89.    Plaintiff and Class Members are entitled to restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on behalf of the Class, prays for relief as follows:

A.    For an order certifying Class, and appointing Plaintiff and her counsel to represent the Class;

B.    For an order awarding Plaintiff and the Class restitution and/or disgorgement and other equitable relief as the Court deems proper;

C.    Actual damages in an amount according to proof;

D.    For an order awarding Plaintiffs and the Class punitive damages as to the appropriate cause of action;

E.    For an order enjoining Defendants:

    1.    under *Business and Professions Code* section 17203 from continuing to engage in business acts and practices, or any of them, which are unlawful, unfair, or fraudulent, as alleged herein; and

    2.    under *Business and Professions Code* section 17535 from continuing to engage in the dissemination of advertisements which are untrue or misleading, alleged herein;

F.    For an order mandating that Defendants engage in a corrective advertising campaign to correct the misperceptions Defendants' conduct created;

G.    For an order awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' and expert-witness fees and other costs pursuant to *Code of Civil Procedure* section 1021.5, and other statutes as may be applicable; and

H.    For an order awarding such other and further relief as this Court may deem just and proper

DATED: October 1, 2009          **MARLIN & SALTZMAN, LLP**

By: _____
     Marcus J. Bradley, Esq.
     Attorneys for Plaintiff

## JURY DEMAND

Plaintiff, on behalf of herself and all other similarly situated, hereby demands a trial by jury in this case.

DATED: October 1, 2009          **MARLIN & SALTZMAN, LLP**

By: _____
     Marcus J. Bradley, Esq.
     Attorneys for Plaintiff

CASE NO. ___
CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS OF EXHIBITS TO COMPLAINT</u>

Exhibit A:  pages 25-39

Exhibit B:  page 41

Exhibit C:  page 43

# EXHIBIT A

000024
EXHIBIT A

2008 Edition

# Overdraft Protection

*A Guide for Bankers*

*Sheshunoff*
CONSULTING · TECHNOLOGY



AMERICAN
BANKERS
ASSOCIATION

**EXHIBIT A**

# Overdraft Protection

## A Guide for Bankers

### CONTENTS

I.    Current Perspective ........................................................................ 1

II.   Common Concerns ......................................................................... 2

Addressing Regulatory Concerns ........................................... 2

Safety and Soundness ............................................................... 3

Define and Document Qualification Criteria ....................... 3

Proactively Manage Risk .......................................................... 3

Legal Risks ................................................................................... 4

Federal Trade Commission Act ............................................... 4

Truth in Lending Act ................................................................. 4

Truth in Savings Act .................................................................. 5

Electronic Fund Transfer Act .................................................. 5

III.  Five Myths of Overdraft Protection .......................................... 5

IV.   Do's and Don'ts ............................................................................. 7

Best Practice Recommendations ............................................. 7

DISCLOSE, DISCLOSE, DISCLOSE ......................................... 8

Discretionary Overdraft Service ........................................ 8

The Question of Disclosing Overdraft Limits ................. 8

Transactions Causing Overdrafts ...................................... 8

Per Item Fees and Payment Order .................................... 9

Prompt Notice of Overdraft Situation ............................. 9

OPT OUT OPTION ..................................................................... 10

ACCOUNT BALANCES ............................................................. 10

MONITOR USAGE ...................................................................... 10

V.    Managing Risk and Public Policy ............................................. 11

VI.   Concluding Remarks ..................................................................... 12

000026

# EXHIBIT A

## Current Perspective

Honoring overdraft items is not a new concept for bankers. Some banks utilize decentralized processes within the branch system where branch managers daily review an overdraft report and decide which items to pay or return and which to charge or waive fees. Some banks use a centralized, objective process where a set overdraft limit is used to pay items with fees consistently assessed for all paid and returned items. Some banks use exception systems where all items are paid and charged and the account officer overrides the default with their specific instructions. Whatever system has been used, the reality is that an Overdraft program/process is not a new concept or service.

What may be new is how to actively manage an overdraft service effectively. In the past few years, various third-party solutions have helped financial institutions set a fixed overdraft limit based on static qualification criteria. This overdraft limit is used to pay items when presented against insufficient funds. Some of these solutions also provided letter templates to communicate with account holders who remain overdrawn. While effective in paying items and back-end management of overdrawn accounts, it is not a very effective approach to proactively manage an overdraft service and mitigating risk.

As overdraft services mature, it is important that the tools to manage the overdraft service grow with the service. Instead of setting an overdraft limit when initially qualified, the financial institution should be monitoring all accounts to determine the best overdraft limit that should be applied to each individual account based on the account's characteristics and its own unique ability to repay an overdraft incident. The tools should provide the ability to change the overall scorecard used to evaluate the accounts and set the overdraft limits or to assign multiple scorecards based on different risk factors, along with analytical reports that identify areas of risk that need closer management.

Communicating with account holders is more important than ever. As more electronic channels, such as ATM and Debit Card transactions, are included in the overdraft service, account holders must be educated on the consequences of initiating these transactions when insufficient funds exist in their account.

Overdraft Protection *A Guide for Bankers*                                                    1

000027

# EXHIBIT A

Moreover, to address the concerns of consumer advocacy groups and public policy, the management tool should have the ability to initiate strategic communications when warranted and to automatically reduce overdraft limits when risk is present.

While the concept of honoring overdrafts is not a new concept to bankers, the concept of managing the overdraft service as a distinct part of the banking operation is. To that end, financial institutions need more sophisticated tools to assist in this management process.

## Common Concerns

## Addressing Regulatory Concerns

The Office of the Comptroller of Currency (OCC) Interpretative Letter 914, dated September 2001, shined a spotlight on "overdraft programs" illuminating particular bank practices and policies that might mislead consumers about the actual workings of overdraft service offerings. This document provided basic guidance to bankers who were considering implementing a discretionary overdraft service, addressing marketing, disclosures, and execution of the service. Since that time, however, charges of unfair practices have continued to emanate from consumer advocacy groups, claiming unfair treatment of consumers due to a lack of clear information about overdraft services and the fees associated with these services.

In 2005, the OCC, Federal Reserve System, Federal Deposit Insurance Corporation (FDIC), and National Credit Union Administration (NCUA) joined together to publish a joint guidance on overdraft protection programs, referred to as the FFIEC Interagency Guidance, after soliciting comments from the financial industry and consumer advocacy groups. Similarly, the Office of Thrift Supervision (OTS) published a guidance document which generally follows in line with the FFIEC Interagency Guidance. The FFIEC Interagency Guidance noted that ". . . aspects of the marketing, disclosure, and implementation of some of these programs have raised concerns with the Agencies. . ." which caused them to issue guidance focusing on Safety and Soundness, Legal Risks, and Best Practices.

2

Sheshunoff Consulting + Technology

000028

# EXHIBIT A

## Safety and Soundness

Bankers should take the utmost care to implement policies and procedures that dynamically manage all aspects of risk and performance of the overdraft service. When an institution pays overdraft items, it creates an obligation for the institution. Thus, risk management is critical to preserve the bank's financial health. Proactively managing the overdraft service and utilizing sophisticated tools to identify and control risk factors provides the most prudent approach to managing an overdraft service.

## Define and Document Qualification Criteria

Since an overdraft service can potentially impact a large number of account holders in a financial institution, it is important that all qualification criteria be clearly documented. Understanding the individual account holder's capacity to repay this overdraft is a responsible approach to managing the relationship. The criteria used to set those overdraft limits should be clearly documented and applied consistently across all account types.

## Proactively Manage Risk

Overdraft services can materially affect a financial institution's overall financial profile, for example, with regard to risk. Actively monitoring performance of overdraft protection programs is critical to managing an overdraft service. The financial institution should be able to regularly review overdraft volumes and risk performance. Additionally, management tools should identify those account holders at risk, thus allowing the immediate reduction of the overdraft threshold or possible elimination of the overdraft privileges until the risk factors are no longer present. The FFIEC Interagency Guidance specifically updated standards for recognizing losses. When an account reaches 60 days consecutively overdrawn from the first overdraft occurrence, the account should be charged off and the loss recognized. Any future collection would be classified as a recovery to the charge off activity.

## Legal Risks

When implementing an overdraft service, the financial institution should adhere to all federal laws and regulations. Additionally, the institution should identify any state laws that would impact the final implementation

000029



and execution of the service. An example would be Reg DD's prohibition against false and misleading advertisements.

## Federal Trade Commission Act

This act requires that all marketing and advertising material accurately represent the terms of the product or service being offered to an account holder. The financial institution should take every opportunity to accurately disclose the fees associated with the overdraft service, the transactions that could cause an overdraft situation, the expectation of a deposit immediately to bring the account to a positive balance, and the discretionary nature of the overdraft service, making clear that the institution is not "agreeing" to pay such overdrafts

## Truth in Lending Act

An overdraft service is not a guarantee to consumers that overdraft items will always be paid. It is a discretionary service provided to help consumers when they present items against insufficient funds. Payment of overdraft items does not imply that future items will be paid as the account will be evaluated at the time of presentment to see if the items can be honored. The financial institution should clearly define these terms in its account disclosures and overdraft policy so that the account holders understand the conditions of the overdraft service.

Under Regulation Z, unless the financial institution has agreed in writing to honor overdraft items, the fees charged for the service are not considered finance charges and do not trigger consumer credit cost disclosures required under the regulation. The fees are only finance charges to the extent they exceed fees for paying or returning items an a similar account without overdraft protection.

## Equal Credit Opportunity Act

As with all financial products and services, a financial institution cannot discriminate on a prohibited basis in the application of the overdraft service. The overdraft service should be applied objectively and consistently across all account types. The discretionary overdraft service should not be applied to

000030

EXHIBIT A

only specifically targeted groups of accounts, while providing less expensive overdraft protection options to other account holders. All account holders should be notified of all other overdraft protection products available.

## Truth in Savings Act

The Regulation implementing the Truth in Savings Act contains a number of provisions related to overdrafts generally and special provisions related to "promoted" overdraft protection services. Promoted overdraft protection services are subject to special advertisement and disclosure requirements, including a requirement to provide on each periodic statement a total of the fees for overdrafts and returned items (provided separately) by period and year to date.

## Electronic Fund Transfer Act

If the account holder will be able to overdraw their account via an ATM transaction or debit card transaction, then periodic statements are required under the Electronic Fund Transfer Act disclosing the transactions, associated fees, and balance.

## III. Five Myths of Overdraft Protection

Above all, bankers need a solid understanding of the customers who use overdraft protection. That's where a few key myths persist:

MYTH
Customers who regularly overdraw their accounts present a higher risk of charge-off.

TRUTH
Research demonstrates that the highest overdraft fee users have a lower charge off rate than light users. Heavy users of overdraft protection are fully aware of the fees and use the service as a convenience. These customers use their checking accounts actively and tend to make more deposits which are then available to cover overdrafts.

000031

EXHIBIT A

**MYTH**

Average Collected Balance (ACB) is a good risk predictor.

**TRUTH**

Many banks base overdraft limits on ACB, employing a 60- or 90-day average collected balance. This measure does not immediately reflect changes in the account. Using software that maintains trends on an account's deposit regularity and adjusts overdraft limits accordingly will allow you to get a better idea about your customer's current conditions and ability to recover NSF balances.

**MYTH**

Account type is an effective risk predictor.

**TRUTH**

Financial institutions offer a number of checking account types, and some set overdraft limits referenced to account type. Research shows that account type has little to do with the amount of overdraft activity, and actually fails to accurately predict risk.

Banks can achieve a much more accurate measure with scoring that contrasts deposit frequency, NSF presentment frequency and NSF recovery spans for a better picture of the customer's risk factors. Scoring software can provide constant account statistics that help the bank determine when it's safe to exercise discretionary overdraft coverage.

**MYTH**

Age of account is the best risk measurement.

**TRUTH**

The older an account gets, the less risk on average. However, account age is not the best measure. Overdraft protection is a retention opportunity, providing a needed service at an opportune time. This convenience creates loyalty.

Deposit regularity is the best risk predictor for overdraft coverage. Tracking customer deposit frequency and changes in deposit patterns is a much better predictor of risk and will help protect both the bank the customer.

6                                              Sheshunoff Consulting + Technology

000032<br>
EXHIBIT A

**IV. Do's and Don'ts**

## Best Practice Recommendations

An overdraft service can provide real benefits to account holders when items are presented against insufficient funds. This service may save the consumer money by avoiding additional return item fees charged by other entities, as well as late charges and interest charges on balances outstanding when an item is returned unpaid.

It would be difficult, though, to overstate the importance -- both in terms of customer experience and regulatory compliance -- of proactive customer education as a cornerstone of an effective overdraft service offering.

The financial institution can implement all the right internal policies and procedures to monitor performance and risk, but still not succeed in having an effective overdraft service if they do not properly educate and notify account holders of the terms and conditions of the overdraft service. Using the account disclosure, overdraft policy, statement messages, and overdraft notice, the financial institution can proactively educate the account holder prior to any presentment of an overdraft item and when an occurrence does happen.

Since a large majority of account holders on average will rarely if ever use the overdraft service, it can be argued that the most effective communications regarding the overdraft service should be directly with those who have used the service. Besides this selective approach being more efficient, any communication to all customers can be interpreted as advertising, even if the message is purely educational and informative. If the "advertising" threshold is crossed, the financial institution is required to follow the guidelines of disclosing periodic fees on statements, cycle-to-date and year-to-date, per Regulation DD Ruling issued May 2005 and effective July 1, 2006.

A more prudent approach is to educate account holders via the appropriate disclosures and related overdraft notice mailings. The following outlines best practice recommendations which are also supported in the FFIEC Interagency Guidance:



000033

EXHIBIT A

# DISCLOSE, DISCLOSE, DISCLOSE

### Discretionary Overdraft Service

One of the most important aspects of implementing an overdraft service is informing account holders about the discretionary nature of the service. The financial institution should not imply that the service is an extension of credit, nor a guarantee that items will always be honored when insufficient funds exist. If the financial institution has alternative forms of overdraft protection available, it should ensure that account holders are aware of and understand these alternatives.

### The Question of Disclosing Overdraft Limits

There are differing views on the question of whether or not to disclose specific overdraft limits to account holders. On the one hand, disclosing a "limit" appears prudent as it provides more information to the account holder. On the other hand, if the financial institution is using a dynamic limit to adjust for changes in risk, the limit is likely to change based on a variety of account-specific factors. In addition, some might think that disclosing an overdraft limit may suggest to account holders that the bank will automatically pay all items up to the disclosed limit.

One approach is to simply communicate that the institution will seek to honor items when presented against insufficient funds, based on how the account holder manages their account with the institution. This will inform the account holder of the intention to provide the service, but not mislead them into thinking it is a guarantee to always honor overdraft items.

### Transactions Causing Overdrafts

It is critical that consumer have the ability to understand which transactions may cause an overdraft situation in their account. It is important that the consumer not have the impression that the overdraft service is only applicable to checks.

The financial institution must update account disclosures with the list of transaction types that could cause an overdraft. While an exhaustive list is not necessary, the disclosure should include electronic transactions along with

8

000034

# EXHIBIT A

checks. The most controversial delivery channels for overdraft services are debit cards, whether at point of sale or at the ATM, because customers are unaware that a debit card transaction that is completed can cause an overdraft and because the overdraft fee can be very large compared with the transaction. Should the institution extend the overdraft service to these channels, it is critical that customers be informed that these transactions could cause an overdraft situation and the fee that will be assessed per transaction.

If applicable, financial institutions should either electronically or via physical signs notify consumers on proprietary ATMs that an overdraft could occur via an ATM transaction. In addition, banks should consider liberal fee refund policies for first instances and daily caps or lower fees for small transactions, where feasible.

### Per Item Fees and Payment Order

Account disclosures must include the overdraft and non-sufficient funds fee assessed for each item presented against insufficient funds. A general description of the payment order or posting order employed by the institution should also be included in the account disclosure.

### Prompt Notice of Overdraft Situation

When items are paid or returned against insufficient funds, the account holder should receive prompt notice of that situation, the items presented, the disposition of the item (paid or returned), the fees assessed, the current balance of the account, and the requirement of an immediate deposit to bring the account positive.

The Overdraft Notice provides the financial institution with another opportunity to educate the account holder about the overdraft service. In addition to the specific items being addressed, the institution should include the per item fee, the transactions that could cause an overdraft situation, the discretionary nature of the service, an "opt out" option, and that other alternatives may be available. Other options include overdraft lines of credit, automatic transfers to savings accounts or credit card accounts, or alerts that balances have fallen below a certain threshold.

000035

**EXHIBIT A**

## OPT OUT OPTION

Despite the customer benefits and conveniences associated with overdraft services, some account holders may prefer not to participate. To accommodate this segment of customers, the financial institution should make clear the process by which account holders can easily opt out of the service. This opt out option should be incorporated into the account disclosure information and into the overdraft notice. Customers who elect to opt out, however, should understand, if applicable, that the opt out applies across all payment channels and that all overdraft items, checks, debit card transactions, preauthorized ACH transactions, will be returned or not approved. Any other limitations on the opt-out should also be explained.

## ACCOUNT BALANCES

Account holders should have access to balance information. The balances provided should include funds available in the account, not inflated by any discretionary overdraft limit that the financial institution uses to facilitate the payment of items presented against insufficient funds. The balance information should also reflect any funds availability holds. Therefore, any balances displayed to account holders, via statements, online banking, ATM inquires, or ATM receipts, should only include funds that accountholders truly have in their account. Where appropriate and feasible, the bank should also explain that the balance does not reflect transactions that have not yet reached the account and been posted.

## MONITOR USAGE

As previously stated, honoring overdraft items presents risks to a financial institution. The financial institution should monitor service usage and adjust overdraft limits based on changes in account activity or status that could indicate changes in a customer's ability to repay overdraft amounts. Additionally, the institution should have tools available to evaluate the overall performance of the service. If the aggregate risk associated with the service is too high and charge offs are increasing, for instance, the institution should have the tools to quickly reduce the overall coverage of the overdraft service. Actively managing the service provides the financial institution with a solution that:

10                                    Sheshunoff Consulting + Technology


000036

1. Removes the subjective review of overdraft items and implements objective criteria to pay overdraft items,

2. Maintains standards that address public policy, and

3. Provides account holders with a service that enhances their ability to manage their financial situation.

## V. Managing Risk and Public Policy

In the adoption of automated overdraft protection programs, many banks set static limits – one limit for all accounts or group of accounts based on product type or age of account. This practice seems clear and just – one overdraft limit applied to all accounts. However, subsequent research shows that static limits can allow some customers to incur a negative balance they cannot recover and disallows coverage of items other customers could easily manage. By failing to protect the customer, static limits can also put the bank at risk. Both of these factors contribute to public policy concerns about overdraft protection service. Not incidentally, static limits can defeat the effort the bank is making to provide better customer service through an overdraft protection program.

The practice of offering overdraft protection programs works most effectively when the automated system that sets limits can assess an account's current condition and adjust limits in response. The system reviews the account's history, extrapolates trends and compares that data to identifiable situations. With this analysis, the system can then set limits on the account to allow coverage or advise return of the NSF item. Instead of one static overdraft limit applied in all situations, the system employs adjustable limits that recognize customer patterns and needs.

Research shows that over time adjustable limits mitigate risks to the bank and help protect the customer. By limiting a customer's exposure, a system operating with adjustable limits addresses concerns that customers can become over-extended with overdraft transactions and fees. By recognizing patterns of responsible overdraft protection usage, the system can adjust coverage to accommodate a customer that has demonstrated ability to recover negative balances. Adjustable limits are more informed and responsive than static limits, thereby protecting the customer, improving account retention, mitigating risk to the bank and addressing public policy concerns.

000037
EXHIBIT A

## VII. Concluding Remarks

Overdraft protection is a service provided to a client. Many of a bank's best customers will regularly use this service to simplify their day to day financial needs. In today's world of automated deposits, electronic payments, electronic bill pay, continually changing clearing patterns and the introduction of new payment methods, a customer may have difficulty predicting when a payment may clear their account. These services help the customer maintain good payment history with their suppliers and vendors while protecting the customer from potentially significant financial penalties.

The key is to be clear regarding your policies and conditions. Further, prudent risk management should always be part of your decision making process. The ability to serve a customer based on their needs and abilities is the foundation of great customer service.

Sheshunoff Consulting + Technology along with the American Bankers Association hope this guide will assist you in implementing an Overdraft Service that is right for you and your customers.

000038
EXHIBIT A

American Bankers Association
1120 Connecticut Avenue, N.W.
Washington, D.C. 20036
1-800-BANKERS ext. 7587
www.aba.com

Sheshunoff Consulting - Technology
2801 Via Fortuna, Ste. 600
Austin, TX 78746
1-800-477-1772
www.shslp.com

**EXHIBIT A**

# EXHIBIT B

000040

EXHIBIT B

**3/16/07 to 3/21/07**

Personal Checking
6/2/2009                                                                                                              Page 1

| Date | Num | Transaction | Payment | C | Deposit | Balance |
|------|-----|-------------|---------|---|---------|---------|
| 3/16/2007 | ATM | Travel Ins2605 N Par  Purchase<br>cat:      Vacation<br>memo:     Card Purchase | 13.93 | R | | 667.82 |
| 3/16/2007 | 2372 | | 200.00 | R | | 467.82 |
| 3/19/2007 | ATM | Useirway  4000 East  Purchase<br>memo:     Card Purchase | 309.80 | R | | 158.02 |
| 3/19/2007 | ATM | Loehmann's1648 Camin  Purchase<br>cat:      Clothing<br>memo:     Card Purchase | 299.48 | R | | -141.46 |
| 3/19/2007 | ATM | Rubio's Co3406 Colle  Purchase<br>memo:     Card Purchase | 13.40 | R | | -154.86 |
| 3/19/2007 | ATM | Tinas              Purchase<br>memo:     Card Purchase | 40.00 | R | | -194.86 |
| 3/19/2007 | ATM | Big K Mark6168 Feder  Purchase<br>cat:      Groceries<br>memo:     Card Purchase | 27.14 | R | | -222.00 |
| 3/19/2007 | 2373 | | 100.00 | R | | -322.00 |
| 3/20/2007 | ATM | Humphreys Half Moon   Purchase<br>memo:     Card Purchase | 192.40 | R | | -514.40 |
| 3/20/2007 | | Nsf Item Paid Fee   031907<br>memo:     NSF Fee | 170.00 | R | | -684.40 |
| 3/20/2007 | 2374 | | 100.00 | R | | -784.40 |
| 3/21/2007 | | Transfer Money<br>cat:      [ASAP I]<br>memo:     Electronic Transfer | | R | 1,000.00 | 215.60 |
| 3/21/2007 | | Nsf Item Paid Fee   032007<br>memo:     NSF Fee | 68.00 | R | | 147.60 |
| 3/21/2007 | ATM | Albertsons7090 Broad  Purchase<br>cat:      Groceries<br>memo:     Card Purchase | 158.25 | R | | -10.65 |

000041

**EXHIBIT B**

# EXHIBIT C

000042
EXHIBIT C

**1/30/07 - 2/1/08**

**Personal Checking**
**6/2/2009**                                                                                            Page 1

| Date | Num | Transaction | Payment | C | Deposit | Balance |
|------|-----|-------------|---------|---|---------|---------|
| 1/30/2008 | | Service Charge<br>cat:     Misc<br>memo:     Service Charge | 9.00 | R | | 84.39 |
| 1/30/2008 | | Enclosed Checks Fee<br>cat:     Misc<br>memo:     Service Charge | 3.00 | R | | 81.39 |
| 1/30/2008 | ATM | Wendys-cam1111 Camin  Purchase<br>cat:     Dining<br>memo:     Card Purchase | 2.78 | R | | 78.81 |
| 1/31/2008 | ATM | Specialty 400 Manley  Purchase<br>memo:     Card Purchase | 127.95 | R | | -49.34 |
| 1/31/2008 | 2462 | | 30.00 | R | | -79.34 |
| 2/1/2008 | | Transfer Money<br>cat:     [ASAP II]<br>memo:     Home Banking Transfer | | R | 500.00 | 420.66 |
| 2/1/2008 | | Nsf Item Paid Fee    013108<br>memo:     NSF Fee | 68.00 | R | | 352.66 |
| 2/1/2008 | ATM | Giant Pizz8230 Feder  Purchase<br>cat:     Groceries<br>memo:     Card Purchase | 20.00 | R | | 332.66 |

000043

**EXHIBIT C**

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SANDRA QUARLES, an individual, on her own behalf and on behalf of all others similarly situated | UNION BANK, N.A. (ALSO DBA UNION BANK OF CALIFORNIA), UNIONBANCAL CORPORATION and DOES 1-100, inclusive |

**(b)** County of Residence of First Listed Plaintiff **San Diego**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Stanley D. Saltzman, Esq.; Marcus J. Bradley, Esq.; MARLIN & SALTZMAN, 29229 Canwood Street, Suite 208, Agoura Hills, CA, 91301; Tel: (818) 991-8080

Attorneys (If Known)

'09 CV 2179 DMS NLS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | **PERSONAL INJURY** ☐ 362 Personal Injury - Med. Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Business & Prof. Code Secs. 17200 and 17500, et seq.    28 USC 1331

Brief description of cause:
unfair business practices; fraud; negligent misrepresentation; covenant of good faith/fair dealing; etc.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE                     DOCKET NUMBER

DATE  10/01/2009

SIGNATURE OF ATTORNEY OF RECORD
Marcus J. Bradley, Esq.

**FOR OFFICE USE ONLY**

RECEIPT # 5866    AMOUNT $350.00    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

MS 10/02/09

CR

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS005866
Cashier ID: msweaney
Transaction Date: 10/02/2009
Payer Name: ABC LEGAL INC
-----------------------------------
CIVIL FILING FEE
 For: QUARLES V UNION BANK
 Case/Party: D-CAS-3-09-CV-002179-001
 Amount:        $350.00
PAPER COPIES
 For: QUARLES V UNION BANK
 Amount:        $2.00
-----------------------------------
CHECK
 Check/Money Order Num: 065828
 Amt Tendered:  $352.00
-----------------------------------
Total Due:     $352.00
Total Tendered: $352.00
Change Amt:    $0.00


There will be a fee of $45.00
charged for any returned check.
```